# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COMMUNITY HOUSE, INC.; MARLENE
K. SMITH; GREG A. LUTHER; JAY D.
BANTA,
                 *Plaintiffs-Appellants,*          No. 05-36195

            v.                                     D.C. No.
CITY OF BOISE, IDAHO; DAVID H.                     CV-05-00283-BLW
BIETER, Mayor; BOISE CITY
COUNCIL; MARYANN JORDAN;                           ORDER
ELAINE CLEGG; VERNON                               AMENDING
BISTERFELDT; DAVID EBERLE;                         OPINION AND
JEROME MAPP; ALAN SHEALY, Boise                    DENYING PANEL
City Council Members; BRUCE                        AND EN BANC
CHATTERTON, Director, Planning                     REHEARING AND
and Development Services; JIM                      AMENDED
BIRDSALL, Manager, Housing and                     OPINION
Community Development,
                 *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
June 7, 2006—Seattle, Washington

Filed November 9, 2006
Amended June 8, 2007

Before: David R. Thompson, A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Thompson;
Partial Concurrence and Partial Dissent by Judge Callahan

6973

## COUNSEL

Howard A. Belodoff, Boise, Idaho, for the plaintiffs-appellants.

Phillip J. Collaer, Boise, Idaho, for the defendants-appellees.

Brent D. Sokol, Los Angeles, California, for *amici curiae* Anti-Defamation League and Americans United for Separation of Church and State.

## ORDER

The Opinion in this case was filed November 9, 2006, and published at 468 F.3d 1118 (9th Cir. 2006). A timely petition for panel rehearing and for rehearing en banc was filed.

Footnote 2 of the Opinion, appearing at 468 F.3d 1123, is deleted. A substituted footnote 2 is inserted in its place, which substituted footnote reads as follows:

> 2.   Although we applied the FHA to a homeless shelter in *Turning Point, Inc. v. City of Caldwell*, 74 F.3d 941, 942 (9th Cir. 1996), the question of whether the FHA generally applies to homeless shelters was not at issue because the parties did not dispute that the FHA applied. We have never squarely addressed the issue of whether all temporary shelters fit within the Act's definition of "dwelling," *see* 42 U.S.C. § 3602(b); nevertheless, we decline to do so here. While the lease states that the Community House facility is to be used as an "emergency homeless shelter," the facility provides more than transient overnight housing. The district court specifically found that the facility generates up to $125,000 in rent per year from forty-nine transitional housing units in which the tenants reside for up to a year and a half. We therefore have little trouble concluding that at least part of the facility "is occupied as, or designed or intended for occupancy as, a residence by one or more families," and thus qualifies as a "dwelling" under section 3602(b).

Moreover, at least in the handicap discrimination context, the regulations interpreting the coverage of the FHA specifically contemplate that "residences" within homeless shelters qualify as "dwellings." The regulations provide that a "dwelling unit" may include "other types of dwellings in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling, rooms in which people sleep." 24 C.F.R. § 100.201. Examples of these other types of dwelling units "include dormitory rooms and sleeping accommodations in shelters intended for occupancy as *a residence for homeless persons*." *Id.* (emphasis added).

With regard to the petition for panel rehearing and for rehearing en banc, Judges Thompson and Tashima voted to deny the petition for panel rehearing and recommended denial of the petition for rehearing en banc. Judge Callahan voted to grant the petition for panel rehearing and to grant the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc and no judge requested a vote on whether to rehear the matter en banc. *See* Fed. R. App. P. 35.

The petition for panel rehearing and for rehearing en banc is DENIED. No further petitions for panel or en banc rehearing will be entertained.

---

**OPINION**

THOMPSON, Senior Circuit Judge:

The plaintiffs-appellants Community House, Inc. ("CHI"), Marlene K. Smith, Greg A. Luther, and Jay D. Banta (collec-

tively, "plaintiffs") appeal the district court's partial denial of their motion for a preliminary injunction against the defendants-appellees City of Boise, Idaho, its mayor, its city council members, and two of its employees.

The City of Boise owned a homeless shelter, Community House, which was managed by CHI and provided housing to men, women, and families. In 2004, the City assumed management of Community House and then leased it to the Boise Rescue Mission Ministries ("BRM"), a Christian non-profit organization. The women and families were removed from Community House, and the BRM now provides shelter there only to homeless men. The BRM also includes a religious component in the services it provides.

The district court declined to order reinstatement of residents that had been removed from Community House, but enjoined the practice of requiring residents to attend worship services in order to receive other services. The court did not preclude the use of Community House by the BRM for voluntarily-attended religious programs.

The plaintiffs assert that the district court abused its discretion by denying a preliminary injunction that (1) would have reinstated Community House residents excluded by the men-only policy, and (2) would have voided the City's lease with the BRM. The plaintiffs argue that the men-only policy violates the Fair Housing Act, and that the lease with the BRM violates the Idaho Constitution and the Establishment Clause of the United States Constitution.

We have jurisdiction under 28 U.S.C. § 1292(a)(1). With regard to the plaintiffs' Fair Housing Act claims based on sex and familial discrimination, we reverse the district court's denial of a preliminary injunction that would have required reinstatement of all former residents. We conclude that the district court erred in applying the test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), because the

City's men-only policy is facially discriminatory. *See Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 n.16 (10th Cir. 1995).

With regard to the plaintiffs' Establishment Clause claim, we reverse the district court's denial of a broader preliminary injunction. We conclude that the district court abused its discretion by determining that only a limited injunction was necessary to avoid an Establishment Clause violation. A broader preliminary injunction is required.

With regard to the plaintiffs' Idaho Constitution claim, which they have raised for the first time in this appeal, for the reasons hereafter set forth we exercise our discretion and decline to consider it.

## I.   BACKGROUND

CHI is a non-profit corporation that provides housing services to homeless and low income persons. Beginning in 1994, CHI and the City worked together to build a homeless shelter known as Community House. Community House contained both a homeless shelter and a low income housing unit. The homeless shelter could hold, in separate dormitories, sixty-six men, thirteen women, and ten families. The low income, or "transitional," housing contained ten family units and thirty-nine single-resident apartments. Community House could accommodate the disabled, and about seventy-five percent of its residents were disabled.

In 2004, following a dispute with CHI, the City took over operation of Community House. The City then initiated a Request for Proposal bid process for the operation of Community House, and ultimately chose the bid of the BRM. The City leased Community House to the BRM on September 2, 2005.

The BRM is a Christian non-profit organization that has served the homeless population of Boise, Idaho for almost

fifty years, most recently at four facilities in both Boise and Nampa, Idaho. The BRM's Boise facilities include a homeless shelter for single men known as the Boise Rescue Mission, and a shelter for women and children known as the City Light Home.

The BRM's winning bid proposal contained a plan to move homeless men from the Boise Rescue Mission to the Community House facility, and then turn the Boise Rescue Mission into a shelter for homeless women and children. The BRM's policy is to segregate men and women into different facilities, and to segregate homeless singles from homeless families. It believes that the difficulties of serving the homeless population "are exacerbated in a mixed gender shelter environment."

The chief goal of the BRM is to "help people at their physical and spiritual points of need" by providing, among other assistance, "Christian teaching." Before dinner, the BRM offers a sixty-minute Christian chapel service. The service consists of singing, scripture reading, prayer, testimonies, and preaching.

In June of 2005, before its lease to the BRM commenced, the City told staff members at Community House not to accept any new residents. In August of 2005, in anticipation of the September 2005 transition to the BRM, the City informed residents of Community House that they needed to move. This move caused significant hardship for some residents, most notably women, families, and the physically disabled. There was already a shortage of housing in the area, and these persons, for the most part, had to move into much less desirable housing than Community House.

The plaintiffs filed this action under the Fair Housing Act[1]

---

[1]Under the Fair Housing Act, it is unlawful to "make unavailable . . . a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It is also unlawful to "make unavailable . . . a dwelling . . . because of a handicap." 42 U.S.C. § 3604(f)(1).

and other laws. The plaintiffs sought a preliminary injunction to prevent the removal of residents from Community House, to reinstate former residents, and to prevent the sale or lease of Community House during the pendency of this action. On October 28, 2005, the district court granted the plaintiffs' motion in part, enjoining the City from relocating any former resident of Community House to housing that is near the residence of a registered sex offender. The district court also enjoined the City from participating in a lease with the BRM if the BRM continued to require attendance at religious meetings as a condition of receiving services. Neither party has challenged these orders.

The district court denied the plaintiffs' request for an injunction requiring that former residents of Community House excluded by the men-only policy be allowed to return. The court determined that the plaintiffs had not raised serious questions that the City was discriminating against women, families, or the disabled under the Fair Housing Act. The district court further denied the plaintiffs' request for a broader injunction regarding the BRM's religious activities at Community House, determining that the court's more limited injunction removed any Establishment Clause violation. This appeal followed.

## II. STANDARD OF REVIEW

Our review of a district court's decision regarding a preliminary injunction is "limited and deferential." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). In general, we review a denial of a preliminary injunction for abuse of discretion. *See id.*

The district court "necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Rucker v. Davis*, 237 F.3d 1113, 1118 (9th Cir. 2001) (en banc), *rev'd on other grounds*, *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125 (2002). When

the district court is alleged to have relied on an erroneous legal premise, we review the underlying issues of law de novo. *See Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996).

## III.   DISCUSSION

### A.   *Requirements for a Preliminary Injunction*

To obtain a preliminary injunction, the moving party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in the moving party's favor. *See Warsoldier v. Woodford*, 418 F.3d 989, 993-94 (9th Cir. 2005). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Id*. at 994 (citation omitted).

### B.   *Fair Housing Act Claims*

The plaintiffs argue that the district court abused its discretion by denying the full preliminary injunction they sought. They contend they have shown that serious questions exist on the merits regarding whether the City, in its lease with the BRM, is discriminating against women, families, and the disabled at Community House in violation of the Fair Housing Act.[2]

---

[2]Although we applied the FHA to a homeless shelter in *Turning Point, Inc. v. City of Caldwell*, 74 F.3d 941, 942 (9th Cir. 1996), the question of whether the FHA generally applies to homeless shelters was not at issue because the parties did not dispute that the FHA applied. We have never squarely addressed the issue of whether all temporary shelters fit within the Act's definition of "dwelling," *see* 42 U.S.C. § 3602(b); nevertheless, we decline to do so here. While the lease states that the Community House facility is to be used as an "emergency homeless shelter," the facility provides more than transient overnight housing. The district court specifically found that the facility generates up to $125,000 in rent per year from forty-nine transitional housing units in which the tenants reside for up to a year

It is undisputed that the balance of hardships tips in favor of the plaintiffs who were excluded from Community House due to the men-only policy. As to the Fair Housing Act claims, therefore, the issue is whether the plaintiffs have raised serious questions that the policies at Community House, which the City authorizes, constitute gender, familial, or disability discrimination in violation of the Fair Housing Act.

## 1.   Gender and Familial Discrimination

The plaintiffs assert that the district court erred in applying the *McDonnell Douglas* test to their gender and familial discrimination claims because the men-only policy at Community House is facially discriminatory. We agree.

**[1]** A facially discriminatory policy is one which on its face applies less favorably to a protected group.[3] *See Frank v.*

---

and a half. We therefore have little trouble concluding that at least part of the facility "is occupied as, or designed or intended for occupancy as, a residence by one or more families," and thus qualifies as a "dwelling" under section 3602(b).

Moreover, at least in the handicap discrimination context, the regulations interpreting the coverage of the FHA specifically contemplate that "residences" within homeless shelters qualify as "dwellings." The regulations provide that a "dwelling unit" may include "other types of dwellings in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling, rooms in which people sleep." 24 C.F.R. § 100.201. Examples of these other types of dwelling units "include dormitory rooms and sleeping accommodations in shelters intended for occupancy as *a residence for homeless persons*." *Id.* (emphasis added).

[3]In examining discrimination issues under the Fair Housing Act, we frequently draw from employment discrimination analysis. *See Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997) ("We apply Title VII discrimination analysis in examining Fair Housing Act ('FHA') discrimination claims. 'Most courts applying the FHA, as amended by the [Fair Housing Act Amendments], have analogized it to Title VII of the Civil

*United Airlines, Inc.*, 216 F.3d 845, 854 (9th Cir. 2000); *see also Bangerter,* 46 F.3d at 1500 (holding that an ordinance that singled out the handicapped and applied different rules to them was facially discriminatory). The men-only policy at Community House is facially discriminatory because it explicitly treats women and families different from men. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 197 (1991). City documents and policy endorse this discrimination.

While the lease between the City and the BRM provides that the BRM shall operate "an emergency homeless shelter with a capacity to serve not fewer than sixty-six (66) *guests*," City Ordinance No. 6404 provides that Community House be operated as "a shelter for a minimum of 66, *single*, homeless, *men*, *ages 18 years or older*." (emphasis added). City Resolution No. 18765, approving the lease of Community House to the BRM, specifically incorporates the restrictions of City Ordinance No. 6404.

More importantly, regardless of the language of the City's lease with the BRM, the City does not dispute that the current policy is to run Community House as a men-only shelter. The district court found that "[i]t is undeniable . . . that the City treated women differently than men" because "the men could reapply to be readmitted [to Community House] by [the] BRM, while the women were shut out by the men-only policy."

**[2]** We hold, contrary to the district court, that the plaintiffs' gender and familial discrimination claims are properly

Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, which prohibits discrimination in employment.' " (quoting *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996))); *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 n.1 (9th Cir. 1996) ("We may look for guidance to employment discrimination cases.").

characterized as claims of facial discrimination and should be analyzed in that framework. The *McDonnell Douglas* test is inapplicable to Fair Housing Act challenges to a facially discriminatory policy. *See Bangerter*, 46 F.3d at 1501 n.16 ("There is no need to probe for a potentially discriminatory motive circumstantially, or to apply the burden-shifting approach outlined in *McDonnell Douglas* . . . as the statute discriminates on its face by allowing conditions to be imposed on group housing for the handicapped which would not be permitted for non-handicapped group housing."); *Reidt v. County of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir. 1992) ("The *McDonnell Douglas* procedure is inapt in a situation involving a facially discriminatory policy . . . ."). Instead, the Supreme Court's decision in *Johnson Controls,* 499 U.S. at 200-01, provides the appropriate approach in facial discrimination cases such as this.

In *Johnson Controls*, the Supreme Court held that an employer's policy barring all women, except those whose infertility was medically documented, from jobs involving lead exposure constituted sex discrimination forbidden under Title VII. *See id.* at 211. The Supreme Court held that the employer's policy was facially discriminatory because it explicitly discriminated against women on the basis of their sex. *See id.* at 197. The Supreme Court noted that this conclusion was not undermined by the ostensibly benign purpose of the employer's policy (protecting women's unconceived offspring). *See id.* at 199 ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination.").

Because the employer's policy in *Johnson Controls* was facially discriminatory, the Supreme Court concluded that the appropriate test was whether sex was a "bona fide occupational qualification" ("BFOQ"). *See id.* at 200; *see also* 42

U.S.C. § 2000e-2(e)(1) (Under Title VII, an employer may discriminate on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation of that particular business or enterprise."). The Supreme Court held that the employer's policy was not within the safety exceptions of the BFOQ defense. *See id*. at 204-06. As a result, the Supreme Court concluded that the employer's facially discriminatory policy violated Title VII. *See id*. at 211.

**[3]** With regard to facially discriminatory housing policies, under the *Johnson Controls* approach, "a plaintiff makes out a prima facie case of intentional discrimination under the [Fair Housing Act] merely by showing that a protected group has been subjected to explicitly differential — i.e. discriminatory — treatment." *Bangerter*, 46 F.3d at 1501. Here, the plaintiffs have established a prima facie case of facial discrimination under the Fair Housing Act because they have explicitly been excluded from Community House based on their gender and familial status.

**[4]** As in the employment context, however, this does not mean that intentional differential treatment can never be justified under the Fair Housing Act. *See id*. at 1501 n.17 ("This is not to say that a government can never justify any intentional differential treatment of the handicapped [under the Fair Housing Act]. Some differential treatment may be objectively legitimate. In the Title VII context, for example, facially discriminatory treatment is permitted if it represents a . . . [ ]BFOQ[ ] that is reasonably necessary to an employer's operations."); *Children's Alliance v. City of Bellevue*, 950 F.Supp. 1491, 1497 (W.D. Wash. 1997) ("Even though the language of the Ordinance singles out individuals for discriminatory treatment based on their familial status and handicap, a proper justification can legitimize the different treatment and validate the Ordinance.").

**[5]** We have not previously adopted a standard for determining the propriety or acceptability of justifications for facial discrimination under the Fair Housing Act.[4] The circuits that have addressed this issue are split. The Eighth Circuit employs the same standards for analyzing a defendant's rationales in challenges under the Fair Housing Act as it applies to claims under the Equal Protection Clause. *See Oxford House-C v. City of St. Louis*, 77 F.3d 249, 252 (8th Cir. 1996) (applying rational basis review to a defendant's proffered justifications for an ordinance that facially discriminated against disabled persons); *Familystyle of St. Paul v. City of St. Paul*, 923 F.2d 91, 94 (8th Cir. 1991) (same). The Sixth and Tenth Circuits employ a more searching method of analysis. To allow the circumstance of facial discrimination under the Sixth and Tenth Circuits' approach, a defendant must show either: (1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes. *See Larkin*, 89 F.3d at 290; *Bangerter*, 46 F.3d at 1503-04.

**[6]** We will follow the standard adopted by the Sixth and Tenth Circuits, which standard is, we believe, more in line with the Supreme Court's analysis in *Johnson Controls*. Moreover, the Eighth Circuit's approach is inappropriate for Fair Housing Act claims because some classes of persons specifically protected by the Fair Housing Act, such as families and the handicapped, are not protected classes for constitu-

---

[4]The Fair Housing Act explicitly provides for certain exceptions to its discrimination prohibitions. *See, e.g.*, 42 U.S.C. § 3604(f)(9) (permitting handicapped discrimination under the Fair Housing Act if the individual's "tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others"); 42 U.S.C. § 3607(b)(1) (providing for a senior housing exemption under the Fair Housing Act). However, none of those exceptions is applicable here.

tional purposes. *See Bangerter,* 46 F.3d at 1503; *Children's Alliance*, 950 F. Supp. at 1497-98.**⁵**

Having determined the appropriate scrutiny to apply for determining whether the City's facial discrimination under the Fair Housing Act is permissible, we now evaluate the City's proffered justifications for the men-only policy at Community House. The City asserts two justifications for the discriminatory policy: (1) safety concerns and (2) the policy allows the BRM to transfer homeless men from its Boise Rescue Mission shelter to Community House, so that it can convert the Boise Rescue Mission into a shelter for women and children.**⁶** We conclude that the plaintiffs have raised serious questions as to whether these asserted justifications satisfy the standards for permissible discrimination under the Fair Housing Act.

The City provides little support to establish that the men-only policy benefits women and families by protecting their safety. The City's only evidence regarding safety concerns is an affidavit from Bill Roscoe, the BRM's Executive Director. Roscoe states that "[a]s a person with nearly 20 years of experience serving the homeless, it is my opinion that mixing disparate populations in the same sleeping facility unnecessarily fosters conflicts." He also states that:

> The problems [of serving the homeless] are exacerbated in a mixed gender shelter environment. Fur-

---

**⁵**The majority of district courts to consider this question have also followed the Sixth and Tenth Circuits' framework. *See, e.g.*, *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F.Supp.2d 208, 228-29 (D.D.C. 2003); *United States v. City of Chicago Heights*, 161 F. Supp.2d 819, 843 (N.D. Ill. 2001); *Children's Alliance*, 950 F.Supp. at 1497-98; *Alliance for the Mentally Ill v. City of Naperville*, 923 F.Supp. 1057, 1074-75 (N.D. Ill. 1996).

**⁶**Depending on the facility, men or women-only shelters might be justified by privacy concerns. The City does not proffer a privacy justification because Community House provides separate rooms for men, women, and families.

ther, it is not always appropriate to have families, particularly families with young or vulnerable children, to sleep in the same facility as other members of the homeless population. We believe that our separate shelter facilities for men and women is one of the reasons why we have fewer police calls at our facilities than Community House. For example, in 2004, all five of Rescue Mission's facilities combined had less than one-half of the police calls of Community House.

**[7]** Other than Roscoe's opinion, the City did not submit a single police report, incident report, or any other documentation that supported any safety concerns. The "fewer police calls" at the BRM's other facilities does not establish that the men-only policy is justified by safety concerns. There could have been fewer police calls due to fewer residents at the other facilities. Or, there could have been fewer police calls due to fewer disabled residents at those facilities and therefore less need for emergency medical assistance.

We do not foreclose the possibility that at a later stage in this litigation, the City may be able to provide evidence to establish that its men-only policy is indeed justified by legitimate safety concerns. *Cf. Everson v. Mich. Dep't of Corrections*, 391 F.3d 737, 751-61 (6th Cir. 2004) (holding that female gender was a bona fide occupational qualification under Title VII for certain officers at female prisons since evidence showed that exclusion of males was reasonably necessary for prison security as well as the safety and privacy of the inmates); *Robino v. Iranon*, 145 F.3d 1109, 1110-11 (9th Cir. 1998) (same). However, at this point in the litigation, the plaintiffs have shown that serious questions exist on the merits as to whether the City's men-only policy at Community House is justified by safety concerns.

The City's other asserted justification for the men-only policy at Community House is that it will allow the BRM to

transfer homeless men from its Boise Rescue Mission shelter to Community House, so that it can convert the Boise Rescue Mission into a shelter for women and families. It argues that the men-only policy benefits women and families because they will only be temporarily disadvantaged in order to receive increased shelter space at the nearby Boise Rescue Mission when its conversion is completed.

**[8]** The plaintiffs, however, have raised serious questions whether women and families will be only temporarily disadvantaged. There is no legal obligation binding the BRM to convert its Boise Rescue Mission shelter to serve women and families. In fact, the BRM admitted that it may never convert its Boise Rescue Mission facility into a shelter for women and families. The BRM told the City that:

> If our proposal to own Community House is accepted, we currently contemplate that we would convert the 6th & Front [i.e., Boise Rescue Mission] facility into an emergency homeless shelter for women and children. Because owning Community House is only a possibility, we have not done any planning, feasibility studies or other evaluations. Therefore, we are unable to provide you with anything more specific. Those studies may indicate that an emergency shelter for women and children is infeasible at our 6th & Front site. Also, we may discover that the property would better serve the needs of the homeless as a center for another program, or that it would simply be better to abandon and sell the property. We will make those decisions once we know whether or not, and on what terms, we will be able to own Community House.

Even if the Boise Rescue Mission is converted into a shelter for women and families, because the plaintiffs have raised serious questions as to the City's safety justification for the discriminatory treatment, there is a serious question that shel-

tering women and families at Boise Rescue Mission separately from men would benefit women and families by satisfying a required safety need. Further, even if the conversion were to occur, women and families could still be disadvantaged by the men-only policy at Community House, because shelter there could be more desirable than shelter at the Boise Rescue Mission. In this regard, Community House, which is owned by the City, must comply with the Establishment Clause while the Boise Rescue Mission, which is not owned by the City, is not so restricted.

**[9]** Because the City's men-only policy at Community House is facially discriminatory regarding women and families, the more stringent test of *Johnson Controls* applies. Under the *Johnson Controls* framework, the plaintiffs have raised serious questions regarding the merits of the City's proffered justifications for the men-only policy at Community House. There is no dispute that the balance of hardships tips in the plaintiffs' favor. Accordingly, the district court abused its discretion by denying the plaintiffs' request under the Fair Housing Act for a preliminary injunction requiring, at this stage of the litigation, reinstatement of Community House residents excluded by the men-only policy.

## 2.  Disability Discrimination

The plaintiffs also argue that the district court erred in holding that they had not raised serious questions that policies at Community House discriminate against persons with disabilities. With regard to the disabled, the City's policies at Community House are not facially discriminatory, and thus the *McDonnell Douglas* test is appropriate for analyzing those claims. In *McDonnell Douglas*, the Supreme Court established a three-stage, burden-shifting test for analyzing disparate treatment discrimination claims under Title VII. *See McDonnell Douglas Corp.*, 411 U.S. at 802-04. The *McDonnell Douglas* test has also been applied in the Fair Housing Act context. *See Gamble*, 104 F.3d at 305.

Under the *McDonnell Douglas* test, the plaintiffs in this case must first establish a prima facie case of discrimination with regard to their disability discrimination claims. *See id.* To establish such a prima facie case, the plaintiffs must show (1) that they are members of a protected class, (2) that applied for and were qualified for shelter at Community House, (3) that they were rejected, and (4) that openings at the shelter remained available. *See id.* After the plaintiffs have established a prima facie case, the burden then shifts to the defendants who must articulate a legitimate, nondiscriminatory reason for their action. *See id.* If the defendants meet their burden, the burden then shifts back to the plaintiffs to prove by a preponderance of the evidence that the reason asserted by the defendants is a mere pretext. *See id.*

**[10]** Here, the plaintiffs have not raised a prima facie case of disparate treatment based on disability. The district court found the limited record showed that both "the former residents of Community House that were moved out and the former residents of the Boise Rescue Mission who were moved in . . . have substantial numbers of disabled individuals in their ranks." While there may be a lower percentage of disabled persons among the new Community House residents, the district court's factual finding is not clearly erroneous. Thus, there is no evidence thus far that any plaintiffs were treated differently *because of* their disability. *See* 42 U.S.C. § 3604(f)(1)-(2).

**[11]** We conclude that the district court did not abuse its discretion by denying a preliminary injunction regarding the plaintiffs' disability discrimination claims.

## C.   *Constitutional Claims*

The plaintiffs additionally argue that the district court should have granted a broader preliminary injunction with regard to their religious establishment claims because the City's lease with the BRM violates the Idaho Constitution and

the Establishment Clause of the First Amendment of the United States Constitution. The plaintiffs assert that they have raised serious questions regarding whether the lease is unconstitutional and therefore they are entitled to the preliminary injunction they sought.

### 1. Waiver

The City argues we should not consider the plaintiffs' constitutional claims because they are being raised for the first time on appeal.

"We will review an issue that has been raised for the first time on appeal under certain narrow circumstances . . . [:] (1) to prevent a miscarriage of justice; (2) when a change in law raises a new issue while an appeal is pending; and (3) when the issue is purely one of law." *Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996) (internal citations omitted). "The decision to consider an issue not raised below is discretionary, and such an issue should not be decided if it would prejudice the other party." *Id*.

[12] We decline to consider the plaintiffs' Idaho Constitution claim raised for the first time in this appeal. Not one of the three narrow circumstances which must exist for us to consider that issue is present in this case. There is no need to prevent a miscarriage of justice, there has been no change of applicable law, and although the plaintiffs argue that the City's lease of Community House to the BRM violates two provisions of the Idaho Constitution, Article 1, section 4 and Article 9, section 5, that question is not a pure question of law. Accordingly, we exercise our discretion not to review the plaintiffs' Idaho Constitution claim.

We will consider, however, the plaintiffs' Establishment Clause claim. The parties dispute whether the Establishment Clause challenge was raised before the district court. We need not resolve whether this issue was raised before that court

because even if a party fails to raise an issue in the district court, we generally will not deem the issue waived if the district court actually considered it. *See Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 206 n.1 (9th Cir. 1991). Here, the district court considered and resolved the Establishment Clause issue. Accordingly, we will consider it.

## 2. Establishment Clause

The plaintiffs argue that the district court abused its discretion by denying the full extent of their requested preliminary injunction because the City's lease with the BRM violates the Establishment Clause of the First Amendment of the United States Constitution. The district court only enjoined the City from leasing Community House to the BRM if the BRM requires attendance at religious meetings as a condition of receiving homeless services. The district court declined to more broadly enjoin the City from participating in a lease with the BRM in which the BRM conducts religious meetings in the Community House facility. We hold that the district court abused its discretion by not granting a broader preliminary injunction with regard to the Establishment Clause claim.

### a. Legal Framework

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion."[7] U.S. Const. amend. I. When assessing whether government aid to religious organizations violates the Establishment Clause, we apply the three-pronged test first articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1972).[8]

---

[7]The Establishment Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *See County of Allegheny v. ACLU*, 492 U.S. 573, 588 (1989).

[8]We recognize that Establishment Clause jurisprudence and the role of the *Lemon* test is uncertain. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709,

Under the *Lemon* test, government action survives an Establishment Clause challenge if it (1) has a secular purpose, (2) has a primary effect of neither advancing nor inhibiting religion, and (3) does not foster excessive government entanglement with religion. *See id.* In *Agostini v. Felton*, 521 U.S. 203, 222-23, 234 (1997), the Supreme Court refined the *Lemon* test by folding the "excessive entanglement" inquiry into, and setting out revised criteria for, the "effect" prong. *See Mitchell v. Helms*, 530 U.S. 793, 807-08 (2000) (Thomas, J., plurality); *see also Mitchell*, 530 U.S. at 844-45 (O'Connor, J., concurring).

**[13]** Thus, under the *Lemon-Agostini* test, we ask (1) "whether the government acted with the purpose of advancing or inhibiting religion," and (2) "whether the [governmental] aid has the 'effect' of advancing or inhibiting religion."[9] *Agostini*, 521 U.S. at 222-23.

The Supreme Court has identified three primary criteria for evaluating whether that aid has the "effect" of advancing religion (i) whether governmental aid results in government

---

727 n.1 (2005) (Thomas, J., concurring) (noting that the Supreme Court properly declined to apply the "discredited" *Lemon* test to an Establishment Clause challenge); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 319 (2000) (Rehnquist, C.J., dissenting) ("*Lemon* has had a checkered career in the decisional law of this Court."); *see also DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 405 (2d Cir. 2001) ("In the wake of a number of fragmented decisions over the past decade, the governing [Establishment Clause] law remains in doubt."). The Supreme Court, however, has not expressly overruled or discarded the *Lemon* test. *Zelman v. Simmons-Harris,* 536 U.S. 639, 668-69 (2002) (O'Connor, J., concurring) (reaffirming that the *Lemon* test is still the central tool of analysis in Establishment Clause cases). Accordingly, we continue to apply it here.

[9]As discussed hereafter, it is clear the City's acts which the plaintiffs challenge were not taken for the purpose of advancing religion, and inhibition of religion is not an issue in this case. The question we must answer is whether the City's challenged action in its lease to the BRM constitutes governmental aid which has the effect of advancing religion.

indoctrination; (ii) whether recipients of the aid are defined by reference to religion; and (iii) whether the aid creates excessive government entanglement with religion. *See Agostini*, 521 U.S. at 234; *see also Mitchell*, 530 U.S. at 808 (Thomas, J., plurality); *Mitchell*, 530 at 845 (O'Connor, J., concurring). The same primary criteria are considered when determining whether aid constitutes an impermissible "endorsement" of religion. *See Agostini*, 521 U.S. at 235; *Mitchell*, 530 U.S. at 845 (O'Connor, J., concurring).

### b. District Court's Decision

In the present case, the district court applied the *Lemon* test and held that only a limited preliminary injunction regarding the City's lease with the BRM was required to avoid an Establishment Clause violation. Under the first *Lemon* prong, the district court found that the lease had the secular purpose of providing shelter to the homeless. With regard to the second *Lemon* prong, the district court determined that the plaintiffs had raised serious questions about whether the primary effect of the lease was secular or religious because there was evidence the BRM required an explanation from any homeless person who did not want to attend a religious meeting, and there was some evidence that the BRM required attendance at religious meetings as a condition of receiving services. As a result, the district court enjoined the City from participating in the lease with the BRM if the BRM directly or indirectly required residents of Community House to attend religious meetings as a condition of receiving housing or other services. With this qualification, the district court found that the primary effect of the lease was secular. The district court also found that its injunction would remove any excessive government entanglement with religion, the third *Lemon* prong, and concluded that the lease would not violate the Establishment Clause. On this basis, the district court denied the plaintiffs' request for a broader preliminary injunction. The district court did not apply the *Agostini* modification to the *Lemon* test, nor did it consider *Mitchell*.

####   c.   Application of Legal Framework to this Case

Applying the *Lemon* test, as modified by *Agostini*, we conclude that the district court abused its discretion by denying a broader preliminary injunction. While the City's lease of Community House to the BRM meets the "purpose" prong of the test of *Lemon-Agostini*, it fails the "effect" prong.

There is no plausible dispute that the City leased Community House to the BRM for the valid secular purpose of providing shelter to the homeless, not to promote religion. The first part of the *Lemon-Agostini* test is therefore not in question and we need not discuss it.

**[14]** The issue is whether the City's lease of Community House to the BRM has the "effect" of advancing religion under the test of *Lemon-Agostini*. *See Agostini*, 521 U.S. at 223; *see also Lemon*, 403 U.S. at 612. The plaintiffs assert that the lease has this effect in two ways. First, they argue the lease creates excessive government entanglement with religion because it requires extensive monitoring of Community House by the City to ensure that there are no violations of the district court's injunction or the Establishment Clause. Second, they argue that the lease results in governmental indoctrination because it provides the BRM with a publicly financed facility in which to spread its religious message.

Addressing the plaintiffs' first argument — excessive entanglement due to extensive monitoring — the plaintiffs have not raised serious questions that the lease will excessively entangle the City with religion. Government oversight to ensure that public funding is not used for religious purposes is not necessarily excessive entanglement. *See KDM v. Reedsport Sch. Dist.*, 196 F.3d 1046, 1051 (9th Cir. 1999). "Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini*, 521 U.S. at 233.

In *Agostini*, the Supreme Court held that unannounced monthly visits (monitoring remedial-education public school

teachers sent to parochial schools) in order to detect or prevent inculcation of religion did not constitute excessive government entanglement. *See id.* at 234 ("[W]e have not found excessive entanglement in cases in which States imposed far more onerous burdens on religious institutions than the monitoring system at issue here.") (citing *Bowen v. Kendrick*, 487 U.S. 589, 615-17 (1988) (finding no excessive entanglement where government reviewed the programs conceived and materials used by religious grantees of federal aid and monitored the recipients' activities through periodic visits)).

At this stage of the litigation, there is insufficient evidence that greater monitoring by the City than that deemed constitutionally permissible in *Agostini* would be required. Accordingly, the plaintiffs have not shown that serious questions exist regarding excessive entanglement as a result of monitoring by the City.

We next consider the plaintiffs' argument that the City's lease of Community House to the BRM results in governmental indoctrination of religion. To satisfy this criterion, the plaintiffs must show (1) that the BRM's activities at Community House constitute or result in indoctrination, and (2) that such indoctrination is attributable to the government. *See DeStefano*, 247 F.3d at 414 (citing *Agostini*, 521 U.S. at 226).

"To 'indoctrinate' means '[t]o instruct in a body of doctrine or principles . . . . To imbue with a partisan or ideological point of view . . . .' The Supreme Court uses 'indoctrination' synonymously with 'inculcation.' To 'inculcate' is '[t]o impress (something) upon the mind of another by frequent instruction or repetition; [to] instill.' " *Id.* (internal citations omitted). The record shows that the BRM conducts a daily sixty-minute Christian chapel service at Community House before dinner. The chapel service consists of singing, scripture reading, prayer, testimonies, and preaching. It thus appears that the BRM is giving instruction in, and imbuing those Community House residents in attendance at the chapel

service with, the tenets of Christianity. This is true even assuming attendance at the chapel service is voluntary.

The plaintiffs have thus raised a serious question that the BRM's activities at Community House constitute religious indoctrination. The next question is whether such indoctrination is attributable to the government. The BRM's lease of Community House is publicly financed.[10] The City charges the BRM rent of $1 per year for five years for a furnished 34,000 square foot building worth at least $2.5 million. The City has also given the BRM a 20-month option to buy the property for $2 million, which is $500,000 less than the minimum value that the City established for the property in July 2005. Under the lease, the City insures the premises and pays for necessary repairs.

The City asserts, however, that religious indoctrination cannot be attributed to it because of its neutral treatment of the BRM. The City points out that there is no evidence that the bid process to lease Community House to the BRM was religiously biased. In addition, the City notes that the prior Community House lease with CHI, a secular organization, provided a fifty year term with rent fixed at $1 per year. Thus, the City's lease with CHI was even more publicly financed than its current lease with the BRM.

In *Mitchell*, Justice Thomas, writing for the plurality, argued that neutral administration of a government aid pro-

---

[10]The publicly-financed nature of the City's lease of Community House to the BRM distinguishes it from those cases in which courts have held that the rental or sale of property to religious organizations did not violate the Establishment Clause because such acts involved the rental or selling of property for fair market value in arm's length business transactions. *See, e.g.*, *Mercier v. Fraternal Order of Eagles*, 395 F.3d 693, 702 (7th Cir. 2005); *Southside Fair Hous. Comm'n v. City of New York*, 928 F.2d 1336, 1348 (2d Cir. 1991); *Christian Sci. Reading Room Jointly Maintained v. City & County of San Francisco*, 784 F.2d 1010, 1014 (9th Cir. 1986).

gram could immunize the state from a charge that disbursement of public funds to religious groups constitutes governmental indoctrination:

> In distinguishing between indoctrination that is attributable to the State and indoctrination that is not, we have consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion. If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government. . . . To put the point differently, if the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose.

*Mitchell*, 530 U.S. at 809-10 (Thomas, J., plurality) (citation omitted).

However, Justice O'Connor disagreed with the plurality's "near-absolute position with respect to neutrality." *Mitchell*, 530 U.S. at 838 (O'Connor, J., concurring). Importantly, Justice O'Connor's concurrence is the controlling authority given that she concurred in the result on narrower grounds than those on which the plurality rested.[11] *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court

---

[11]Justice Breyer joined Justice O'Connor's concurrence in *Mitchell*. The dissent, written by Justice Souter and joined by Justices Stevens and Ginsburg, also disagreed with the plurality's "espous[al] of a new conception of neutrality as a practically sufficient test of constitutionality." *Id.* at 869 (Souter, J., dissenting). Thus, five Justices in *Mitchell* explicitly disagreed with the plurality's discussion on neutrality.

decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (citation omitted); *see also Gentala v. City of Tucson,* 244 F.3d 1065, 1076 (9th Cir. 2001) ("We are left . . . with a clear holding by a Supreme Court majority that when the government subsidizes religious activity, the fact that it is doing so pursuant to a program that treats religious speech or association coequally with other speech is not, standing alone, determinative in Establishment Clause analysis."), *rev'd on other grounds*, 534 U.S. 946 (2001); *DeStefano*, 247 F.3d at 418 (stating that Justice O'Connor's view in *Mitchell* is controlling); *Columbia Union Coll. v. Oliver*, 254 F.3d 496, 504, 504 n.1 (4th Cir. 2001) (same); *Simmons-Harris v. Zelman*, 234 F.3d 945, 957 (6th Cir. 2000) (same), *rev'd on other grounds*, 536 U.S. 639 (2002).

In her concurrence in *Mitchell*, Justice O'Connor did not dispute that "neutrality is an important" factor in deciding Establishment Clause aid cases. *Mitchell*, 530 U.S. at 838 (O'Connor, J., concurring). However, she noted that "[w]e have never held that a government-aid program passes constitutional muster *solely* because of the neutral criteria it employs as a basis for distributing aid." *Id*. at 839.

Justice O'Connor also disagreed with the *Mitchell* plurality's conclusion that actual diversion of government aid to religious indoctrination does not indicate an impropriety under the Establishment Clause.[12] *See id*. at 840. In contrast to the

---

[12]In addition to neutrality, the plurality opinion focused on whether the government aid has religious or secular content and dismissed inquiring into whether the aid was diverted for religious purposes:

The issue is not divertibility of aid but rather whether the aid itself has an impermissible content. Where the aid would be suitable for use in a public school, it is also suitable for use in any private school. Similarly, the prohibition against the government

plurality, she emphasized that "actual diversion of government aid to religious indoctrination" is constitutionally suspect and is more central to the Establishment Clause jurisprudence than neutrality or secular content.[13] *Id*. She noted that although Supreme Court "cases have permitted some government funding of secular functions performed by sectarian organizations," the Court's decisions "provide no precedent for the use of public funds to finance religious activities." *Id*. (citation omitted).

**[15]** Thus, *Mitchell* stands for the proposition that actual diversion of secular government aid to religious indoctrination violates the Establishment Clause. *See id*. at 840-42. Here, according to the showing that has been made at this stage of the litigation, it appears that the aid from the City (i.e., the subsidized Community House facility) is actually being diverted for Christian chapel services in addition to other services for the homeless. Accordingly, under *Mitchell*, the plaintiffs have raised serious questions that the BRM's religious indoctrination occurring at Community House is attributable to the City.

Other Supreme Court cases support the conclusion that, to avoid an Establishment Clause violation, a publicly financed government building may not be diverted to religious use. *See Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 760-61 (1976) (upholding program of direct state financial aid to private col-

---

> providing impermissible content resolves the Establishment Clause concerns that exist if aid is actually diverted to religious uses.

*Mitchell*, 530 U.S. at 822 (Thomas, J., plurality).

[13]The *Mitchell* dissent would go further than Justice O'Connor's emphasis on *actual* diversion and would hold unconstitutional government aid if there is a *substantial risk* that it will be diverted to religious uses. *See id*. at 890 (Souter, J., dissenting) ("[W]e have long held government aid invalid when circumstances would allow its diversion to religious education.").

leges and universities, including religious ones, because there was a statutory prohibition against sectarian use of the funds); *Hunt v. McNair*, 413 U.S. 734, 744-45 (1973) (upholding program of state aid to colleges and universities, including religious ones, to finance construction because funds were not allowed to be used for the construction of religious facilities).

Indeed, in *Tilton v. Richardson*, 403 U.S. 672 (1971), the Supreme Court overturned a portion of a statute that authorized federal loans and grants to institutions of higher learning that would have allowed publicly financed buildings to be used for religious purposes because that portion of the statute violated the Establishment Clause. While the statute contained a provision prohibiting the use of the funds to construct facilities for sectarian worship, the provision expired after twenty years. *See id*. at 675. Applying the *Lemon* test, the Court held that if, after expiration of the twenty-year prohibitory period, the benefitted religious institutions used the facilities for sectarian worship, then the "effect" of the government's grant would be religious advancement. *See id*. at 683. The Court thus struck down the expiration of the twenty-year limit in order to avoid an Establishment Clause violation. *See id*. at 689.

**[16]** Because the plaintiffs have raised serious questions as to whether the BRM's religious activities at the publicly-financed Community House facility constitute governmental indoctrination of religion, they have established that serious questions exist regarding whether the City's aid to the BRM has the "effect" of advancing religion. The plaintiffs have, therefore, raised serious questions regarding an Establishment Clause violation.

**[17]** The fact that the plaintiffs have raised "serious First Amendment questions compels a finding that there exists 'the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [the plaintiffs'] favor.' *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973

(9th Cir. 2002) (quoting *Viacom Int'l, Inc. v. FCC,* 828 F. Supp. 741, 744 (N.D. Cal. 1993)). We therefore hold that the plaintiffs have demonstrated that the balance of hardships tips in their favor. *See id.* at 974. We conclude that the district court abused its discretion by denying the plaintiffs' request for a broader preliminary injunction. The district court should have enjoined the conduct of the chapel services and other religious activities at Community House, even if participation in those activities is voluntary.

## IV.  CONCLUSION

The district court appropriately applied the *McDonnell Douglas* test to the plaintiffs' disability discrimination claims and we affirm its denial of a preliminary injunction as to those contentions.

We reverse the district court's denial of a preliminary injunction, both with regard to the men-only policy at Community House and with regard to the religious activities at Community House. Because the men-only policy at Community House is facially discriminatory, the district court erred in applying the *McDonnell Douglas* test. Under the facial discrimination test of *Johnson Controls*, the plaintiffs have raised serious questions as to whether the City is discriminating against women and families in violation of the Fair Housing Act. There is no dispute that the balance of hardships tips in favor of the plaintiffs. Accordingly, we reverse the district court's denial of the plaintiffs' request for a preliminary injunction that would require the reinstatement of Community House residents excluded by the men-only policy.

The plaintiffs have also raised serious questions as to whether the City's aid to the BRM by providing it with the Community House building has the "effect" of advancing religion and violates the Establishment Clause. The balance of hardships as to this claim tips in the plaintiffs' favor. We, therefore, reverse the district court's denial of the plaintiffs'

request for a broader preliminary injunction prohibiting chapel services and other religious activities at the Community House facility. Each party shall bear his, her, and its own costs on appeal.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

CALLAHAN, Circuit Judge concurring and dissenting:

I agree with much of the majority opinion; however, on three important points we part company.[1] First, while I agree with the majority that the district court should have applied the test set forth in *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 200-01 (1991), I read the record as including evidence that the temporary dislocation of homeless women was necessary for safety concerns and for the long-term increase in the facilities available to homeless women. Second, even if there is some question as to whether the overall scheme constituted a "bona fide occupational qualification" under *Johnson Controls*, *id.* at 200, the appropriate remedy is to vacate the district court's order and remand for further proceedings. Third, although the majority correctly identifies the critical issue on appellants' Establishment Clause claim, its conclusion that the Boise Rescue Mission Ministries' voluntary chapel services constitute religious indoctrination *attributable to the government* is neither factually nor legally sound.

---

[1]I concur in the majority's affirmance of the district court's denial of relief on appellants' disability discrimination claims and the decision to decline to consider the appellants' claim under the Idaho Constitution.

I

My analysis starts with the same factual determination as the majority: the men-only policy at Community House is facially discriminatory because it explicitly treats women and families different from men. Furthermore, we agree that the district court erred in applying the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), and should have applied the approach adopted in *Johnson Controls*, 499 U.S. 187. In *Johnson Controls*, the Supreme Court held that discrimination based on gender was forbidden under Title VII "unless respondent can establish that sex is a 'bona fide occupational qualification.' " ("BFOQ") *Id*. at 200.

I also agree with the majority that in examining discrimination issues under the Fair Housing Act, we have frequently drawn from employment discrimination analysis (*see* maj. op. 6985-86 n.3), and importantly, that we "have not previously adopted a standard for determining the propriety or acceptability of justifications for facial discrimination under the Fair Housing Act." (maj. op. 6989) I appreciate the majority's recognition of a split between our sister circuits as to the standard to be applied for analyzing a defendant's rationales in challenges under the Fair Housing Act as it applies to claims under the Equal Protection Clause. I do not object to the majority's adoption of the approach adopted by the Sixth and Tenth Circuits in requiring that a restriction be based on legitimate public concerns, rather than stereotypes, and benefits the protected class. *See Larkin v. Michigan Dep't of Social Servs.*, 89 F.3d 285, 290 (6th Cir. 1996), and *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503-04 (10th Cir. 1995). Nonetheless, applying this more exacting test, appellants have not demonstrated that they are entitled to injunctive relief.

The City proffered two justifications for the men-only policy at Community House: (1) safety concerns, and (2) transferring men to Community House would allow Boise Rescue Mission Ministries ("BRM") to convert another one of its

facilities into a shelter for women and children. The safety concerns are the type of legitimate interests, not based on stereotypes, that may satisfy the first prong of the test for allowing a facially discriminatory provision. Indeed, the majority recognizes that safety concerns might justify the men-only policy. (*See* maj. op. 6991) I would affirm as I agree with the district court that "the record contains evidence supporting the safety problems inherent in housing homeless men with homeless women." Moreover, even if I were to determine that safety concerns were not adequately addressed on this record, I would remand the matter to the district court to take additional evidence.[2]

The City addressed the second prong of the test by offering evidence that the men-only policy at Community House was only a temporary disadvantage necessary to allow the conversion of the nearby Boise Rescue Mission into increased shelter space for women and children. In *Bangerter*, the Tenth Circuit observed that "courts have uniformly allowed defendants to justify their conduct despite the discriminatory impact if they can prove that they 'furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect' " and noted that a similar approach had been suggested for certain intentional discrimination claims under the Fair Housing Act. 46 F.3d at 1504-05 (internal citations omitted).

---

[2]The district court noted that Community House contained both a homeless shelter and a low-cost housing unit. The homeless shelter could hold in separate dorms, 66 men and 13 women. There were ten units for homeless families and another ten units for low income, or "transitional," housing as well as 39 single-residence apartments. Community House had accommodations for the disabled, and about three-fourths of its residents were disabled. This mix of homeless single adults, families with children, and the disabled (mentally and physically) would appear to be a volatile mix.

Here, the district court held:

> It appears to the court that with the lease, the city
> seized the opportunity to (1) turn over operations of
> Community House to an expert; (2) immediately
> increase the space for homeless men; and (3) eventu-
> ally increase the space for homeless women and chil-
> dren. In other words, the City made the political
> decision to trade short-term hardship for long-term
> gain.
>
> If the Court were to intervene, it would simply trans-
> fer the hardship from one class of homeless women
> to another. By ordering the return of former female
> residents to Community House, the Court would
> scuttle any deal for increased space at the Boise Res-
> cue Mission and shift the hardship to the women
> who would have occupied that space.
>
> This case is about scarce resources, not discrimina-
> tion.

I would hold that the district court's reasoning supports a
determination that the men-only policy at the Community
House was in effect a "BFOQ" intended to result in additional
and better shelters for women and children.[3] We should not be
so shortsighted as to not recognize that improving the housing
for certain groups of people may require some short-term dis-
advantages.

It is not clear whether the majority disagrees with the prop-
osition that the long-term benefits may justify short-term dis-
advantages. It seems to question the factual premise of the

---

[3]I recognize that while the concept of a "BFOQ" may be borrowed from
employment discrimination cases, the exact contours of a bona fide gov-
ernment interest in litigation under the Fair Housing Act may have to be
altered to reflect certain differences between housing and employment.

district court's determination, rather than its legal analysis. The majority cites BRM's reticence, prior to the approval of its bid for Community House, to commit to the conversion of the Boise Rescue Mission. The district court, however, found that "BRM made that commitment in its proposal to the City, and there is no evidence that the BRM intends not to honor its commitment."

I would hold that although the district court erred in applying the *McDonnell Douglas* standard instead of the *Johnson Controls* approach, the error was harmless because the City presented evidence that fairly supports the district court's determination that the men-only policy was part of a program designed to increase the homeless shelter available to women and children, and this determination is entitled to deference. *Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) ("A district court's order with respect to preliminary injunctive relief is subject to limited appellate review, and we will reverse only if the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." (internal quotation marks and citation omitted)).

## II

Moreover, if the district court's error is not harmless, the proper remedy is not the issuance of injunctive relief, but the vacation of the district court's denial of the preliminary injunction and a remand to allow the district court to develop the underlying facts and to apply circuit law as articulated in this opinion. In the penultimate paragraph in its opinion in *Bangerter*, the Tenth Circuit wrote:

> These courts all recognize the importance of leaving room for flexible solutions to address the complex problem of discrimination and to realize the goals established by Congress in the Fair Housing Act.

> However, once again, such an analysis cannot be performed on the pleadings alone.
>
> . . .
>
> It could be that the evidence will show that such a neighborhood advisory committee might prove to be beneficial to the handicapped, increasing their access to, and acceptability in, the neighborhood. Only after a record has been developed can the district court, and ultimately our Court, determine whether these restrictions violate the FHAA.

46 F.3d at 1505 (footnotes omitted). These concerns recommend that we stay our hand and remand this case to allow for further development of the evidence.

The majority, however, charges into the fray, despite recognizing that the applicable law and relevant facts are less than clear, and without citing any authority for its activism. Indeed, the single case cited by the majority for the "requirements for a preliminary injunction," *Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005), concludes by reversing and remanding "for further proceedings not inconsistent with this opinion." *Id.* at 1002. In light of the majority's enunciation of a standard that admittedly was not clear when the district court acted and the inevitable effects of the passage of time, the proper form of relief — were relief warranted — is a vacation of the district court's denial of injunctive relief and a remand for further proceedings consistent with this court's opinion.

III

Again, I start at the same place as the majority on appellants' Establishment Clause claim, but cannot agree that appellants have demonstrated that they are entitled to affirmative action from this court or the district court. We agree that the appropriate test is that set forth in *Lemon v. Kurtzman*,

403 U.S. 602, 612-23 (1971), and modified by *Agostini v. Felton*, 521 U.S. 203, 222-23, 234 (1997). *See also Mitchell v. Helms*, 530 U.S. 793, 807-08 (2000) (Thomas, J., plurality) and *Mitchell*, 530 U.S. at 844-45 (O'Connor, J., concurring).

As noted by Justice O'Connor in her concurring opinion in *Mitchell,* following *Agostini,* the Court has

> articulated three primary criteria to guide the determination whether a government-aid program impermissibly advances religion: (1) whether the aid results in governmental indoctrination, (2) whether the aid program defines its recipients by reference to religion, and (3) whether the aid creates an excessive entanglement between government and religion.

530 U.S. at 845. Here, we agree that the appellants have not shown that serious questions exist regarding excessive entanglement (*see* maj. op. 7000), and it appears that neither the City in its lease, nor the BRM in managing the shelter, "defines the recipients by reference to religion." Thus, for there to be any violation of the Establishment Clause there must be "governmental indoctrination."

The majority reasons that "governmental indoctrination" has two components: (1) that BRM's activities at Community House constitute or result in indoctrination, and (2) that such indoctrination is attributable to the government. (*See* maj. op. 7000, citing *DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 414 (2d Cir. 2001)). For the purposes of this dissent, I accept the majority's determination that BRM's holding of chapel services constitutes "indoctrination." The majority, however, fails to appreciate the Supreme Court's opinions in *Agostini* and *Mitchell* when it concludes that this "indoctrination" is attributable to the City.

The majority's conclusion is based on its finding that "it appears that the aid from the City (i.e. the Community House

facility) is actually being diverted for Christian chapel ser-
vices in addition to other services for the homeless." (maj. op.
7004) This finding is factually suspect and employs disap-
proved legal analysis.

On the existing record, it is questionable whether there is
any "aid" flowing from the city to the BRM. What is known
is that the BRM pays the City a dollar a year. The BRM has
a five-year lease, and the City insures the premises and pays
for necessary repairs. The majority also notes that the BRM
has a 20-month option to buy the property for two million
dollars, which is $500,000 less than the minimum value that
the City established for the property in July 2005. But, there
is no suggestion that the BRM's bid was not the best bid that
the City received. Also, as the majority notes, the City's prior
lease with a secular organization was even more favorable to
the lessee. Furthermore, it appears that Community House
was constructed with federal funds and that this restricts what
the City can do with Community House. In addition, the
record reflects that the BRM is a Christian non-profit organi-
zation that serves the homeless population in Boise. There is
nothing in the record to suggest that the lease of Community
House somehow enriches the BRM. Rather, it appears that the
lease allows the BRM to provide homeless shelters that other-
wise would have to be furnished (and paid for) by the City or
simply would not exist. Perhaps a record could be developed
to show that the lease constitutes "aid" from the City to the
BRM, but the present record neither compels, nor supports,
such a factual determination.

The majority's conclusion is also based on a concept of
diversion that was strongly rejected in *Mitchell* both by Jus-
tice Thomas in his plurality opinion and by Justice O'Connor
in her concurring opinion. The majority's reasoning appears
to be that whatever "aid" flows from the City to the BRM by
way of the lease is "diverted" from the secular purpose of the
lease — providing shelter — to the religious purpose of hold-

ing non-mandatory chapel services. This is out of step with the plurality and concurring opinions in *Mitchell*.

The situation at bar does not constitute governmental indoctrination under Justice Thomas's plurality opinion in *Mitchell*. Although *Mitchell* concerned a distinct issue, aid to private religious schools, the impact of the plurality's position on this case is clear. Justice Thomas wrote:

> In distinguishing between indoctrination that is attributable to the State and indoctrination that is not, we have consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion. If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government. For attribution of indoctrination is a relative question. If the government is offering assistance to recipients who provide, so to speak, a broad range of indoctrination, the government itself is not thought responsible for any particular indoctrination.

530 U.S. at 809-10. In our case, the City, pursuant to a request for proposals, determined that the BRM could best meet its secular purpose of providing shelter to the homeless. Under the plurality's approach, the incidental holding of voluntary chapel services for the homeless does not rise to the level of governmental indoctrination. Justice Thomas recognized that the aid in issue in *Mitchell* could indirectly benefit the religion that operated the school, but held that this could not reasonably be viewed as an endorsement of religion.[4] *Id*. at 835. Jus-

---

[4]Justice Thomas explained:

> A concern for divertibility, as opposed to improper content, is misplaced not only because it fails to explain why the sort of aid

tice Thomas's plurality opinion should be read in conjunction with Justice O'Connor's concurring opinion. The majority here focuses on Justice O'Connor's statement that the Court has "never held that a government-aid program passes constitutional muster *solely* because of the neutral criteria it employs as a basis for distributing aid." *Mitchell*, 530 U.S. at 839 (emphasis in original), and her objection to the "actual diversion of government aid to religious indoctrination." (maj. op. 7003) This misses the critical distinction between Justice O'Connor's concurring opinion and Justice Souter's dissent. Justice O'Connor, joined by Justice Breyer, held that *the aid in issue in Mitchell did not result in governmental indoctrination*, even though it obviously had some indirect benefit to the religion that ran the school. Similarly, even assuming that some aid flows from the City to the BRM, under Justice O'Connor's concurring opinion in *Mitchell*, this does not amount to government indoctrination.

Justice O'Connor observed that in recent years the Court "had taken a more forgiving view of neutral government programs that make aid available generally without regard to the religious or nonreligious character of the recipient." *Mitchell*, 530 U.S. at 847, citing *Agostini*, 521 U.S. at 225-26. In addition, she, like the plurality, recognized that almost any aid could be diverted.[5] To meet these realities, Justice O'Connor

---

that we have allowed is permissible, but also because it is boundless — enveloping all aid, no matter how trivial — and thus has only the most attenuated (if any) link to any realistic concern for preventing an "establishment of religion." Presumably, for example, government-provided lecterns, chalk, crayons, pens, paper, and paintbrushes would have to be excluded from religious schools under respondents' proposed rule. But we fail to see how indoctrination by means of (*i.e.,* diversion of) such aid could be attributed to the government.

*Id*. at 824. Similarly, in this case, it is doubtful whether — as a matter of law — the supposed diversion of "aid" to the BRM's chapel services could be attributed to the City.

[5]Justice O'Connor observed:

An educator can use virtually any instructional tool, whether it

proposed that to "establish a First Amendment violation, plaintiffs must prove that the aid in question actually is, or has been, used for religious purposes." *Id.* at 857. However, she would reject any presumption that secular restrictions were not followed. *Id.* at 859. Justice O'Connor also indicated that a *de minimis* diversion would not raise constitutional concerns.[6] *Id.* at 861.

In our case, any aid flowing from the City to the BRM is truly *de minimis.* The BRM has agreed to undertake the not inconsiderable expense of maintaining a homeless shelter, in return for the City insuring the premises and paying for necessary repairs.[7] As it does not appear that the BRM receives any

---

has ascertainable content or not, to teach a religious message. In this respect, I agree with the plurality that "it is hard to imagine any book that could not, in even moderately skilled hands, serve to illustrate a religious message." *Ante,* at 2549. In today's case, for example, we are asked to draw a constitutional distinction between lending a textbook and lending a library book. Justice SOUTER's try at justifying that distinction only demonstrates the absurdity on which such a difference must rest. He states that "[a]lthough library books, like textbooks, have fixed content, religious teachers can assign secular library books for religious critique." *Post,* at 2592. Regardless of whether that explanation is even correct (for a student surely could be given a religious assignment in connection with a textbook too), it is hardly a distinction on which constitutional law should turn. Moreover, if the mere ability of a teacher to devise a religious lesson involving the secular aid in question suffices to hold the provision of that aid unconstitutional, it is difficult to discern any limiting principle to the divertibility rule. For example, even a publicly financed lunch would apparently be unconstitutional under a divertibility rationale because religious school officials conceivably could use the lunch to lead the students in a blessing over the bread.

*Id.* at 855.

[6]Justice O'Connor wrote: "[t]he limited evidence amassed by respondents during 4 years of discovery (which began approximately 15 years ago) is at best *de minimis* and therefore insufficient to affect the constitutional inquiry." *Id.* at 861.

[7]The City may well have these obligations regardless of the identity of the lessee, or whether the building is leased.

funds from the City, there is no possibility of any actual diversion of money. Accordingly, the majority ventures into the relatively unchartered waters of determining when intangible assistance from a governmental entity amounts to "governmental indoctrination." I would not embark on this course because, here, conducting chapel services at which attendance is voluntary, in conjunction with generally providing homeless services, simply does not rise to a level of constitutional concern.

Finally, even if it were determined that holding voluntary chapel services could amount to government indoctrination, the proper course, as previously explained (*see* Part II), would be to vacate the district court's denial of injunctive relief, and to remand to allow the parties to present the factual evidence necessary for even a preliminary determination that the BRM's holding of voluntary chapel services might amount to government indoctrination.

IV

In sum, I would affirm the district court's denial of a preliminary injunction. Although the district court erred in failing to apply the test set forth in *Johnson Controls*, 499 U.S. at 200-01, this was harmless error because the record shows that the City offered two bona fide government interests to sustain the lease. In addition, this record contains no showing of the "governmental indoctrination" necessary for judicial relief from an alleged violation of the Establishment Clause under the Supreme Court's opinions in *Agostini*, 521 U.S. 203, and *Mitchell*, 530 U.S. 793. Lastly, even if the district court had erred in denying the appellants preliminary relief, the proper remedy would be a remand for further proceedings consistent with our opinion.