Matter of Oceanview Home for Adults, Inc. v Zucker (2023 NY Slip Op 02365)

Matter of Oceanview Home for Adults, Inc. v Zucker

2023 NY Slip Op 02365

Decided on May 4, 2023

Appellate Division, Third Department

Lynch, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:May 4, 2023

CV-22-1940 

[*1]In the Matter of Oceanview Home for Adults, Inc., Doing Business as Oceanview Manor, Respondent,
v
Howard Zucker, as Commissioner of Health, Appellant, et al., Respondent.

Calendar Date:March 30, 2023

Before: Garry, P.J., Lynch, Pritzker, Reynolds Fitzgerald and McShan, JJ.

Constantine Cannon LLP, New York City (Gary J. Malone of counsel), for appellant.
O'Connell and Aronowitz, Albany (Michael Y. Hawrylchak of counsel), for Oceanview Home for Adults, Inc., respondent.
Disability Rights New York, Brooklyn (Marc Fliedner of counsel), for Class Counsel for the Federal Settlement, amicus curiae.
Hinman Straub PC, Albany (David T. Luntz of counsel), for Empire State Association of Assisted Living, Inc., amicus curiae.

Lynch, J.
Appeal from an amended judgment of the Supreme Court (Margaret T. Walsh, J.), entered October 18, 2022 in Albany County, which partially granted petitioner's application, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, to, among other things, declare invalid certain regulations promulgated by respondent Commissioner of Health.
In 1999, the Supreme Court of the United States issued a landmark decision interpreting the states' obligations under Title II of the Americans with Disabilities Act (hereinafter ADA) to ensure that persons with mental disabilities are not unjustifiably isolated in institutions and are provided services in the most integrated setting appropriate to their needs (see Olmstead v L.C. ex rel. Zimring, 527 US 581 [1999]). Justice Ginsberg, writing for the majority, explained that the ADA is "intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' " (id. at 589, quoting 42 USC § 12101 [b] [1]), concluding that "unjustified institutional isolation of persons with disabilities is a form of discrimination" and that integration of such persons into community-based settings is required upon certain conditions (Olmstead v L.C. ex rel. Zimring, 527 US at 600, 587). In so holding, the Court recognized that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of [such] individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment" (id. at 600, 601).
Although the Olmstead Court did not establish fixed guideposts for implementing this integration mandate on a national level, it highlighted the importance of relying on the assessments of the states' mental health professionals in determining the appropriateness of serving individuals with disabilities in community-based settings (see id. at 602). A plurality of the Court also emphasized that, under the ADA, states generally have an obligation to "make reasonable modifications in policies, practices, or procedures . . . necessary to avoid discrimination on the basis of disability" (28 CFR 35.130 [b] [7] [i]; see Olmstead L.C. ex rel. Zimring, 527 US at 592), writing that, "[i]f . . . [a] [s]tate were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, . . . the reasonable-modifications standard would be met" (Olmstead v L.C. ex rel. Zimring, 527 US at 605-606).
Following Olmstead, a series of federal lawsuits were filed challenging the State's provision of services for persons with mental illness living in adult homes. To that end, Disability Advocates, Inc. (hereinafter DAI and [*2]now known as Disability Rights New York) commenced an action "on behalf of individuals with mental illness residing in, or at risk of entry into" certain large adult homes [FN1] in New York City — those "with more than 120 beds and in which [25] residents or 25% of the resident population (whichever is fewer) have a mental illness" — arguing that they were not receiving services in the most integrated setting appropriate to their needs (Disability Advocates, Inc. v Paterson, 653 F Supp 2d 184, 187 [ED NY 2009], vacated sub nom. Disability Advocates, Inc. v New York Coalition for Quality Assisted Living, Inc., 675 F3d 149, 162-163 [2d Cir 2012]). After a lengthy trial, the District Court agreed, finding that the adult homes were "institutions that segregate[d] residents from the community and impede[d] [their] interactions with people who do not have disabilities" and, therefore, DAI proved by a preponderance of the evidence a violation of the integration mandate of Title II of the ADA (id. at 187). On appeal, the Second Circuit vacated the District Court's judgment on the ground that DAI lacked standing to bring the action (see Disability Advocates, Inc. v New York Coalition for Quality Assisted Living, Inc., 675 F3d at 162-163).
Thereafter, the Department of Justice (hereinafter DOJ) and a class of persons with mental illness separately filed suits against the State (hereinafter collectively referred to as the O'Toole action), raising nearly identical claims as those asserted by DAI (see United States v New York, US Dist Ct, ED NY, 13-cv-4165). These actions were consolidated and ended in a settlement under which the State agreed to take certain remedial action on behalf of individuals with mental illness living in adult homes, including providing the opportunity to move into community-based, supported housing (see United States v New York, 2017 WL 2616959, *2 [ED NY, June 15, 2017, Nos. 13-cv-4165, 13-cv-4166, 16-cv-1683 (NGG) (RML) (RER), Garaufis, J.]; see also Residents & Families United to Save Our Adult Homes v Zucker, 2017 WL 5496277, *2 [ED NY, Jan. 24, 2017, No. 16-cv-1683 (NGG), Garaufis, J.]).
Meanwhile, the State embarked on its own endeavor to implement Olmstead (see 28 CFR 35.130 [b] [7] [i]). The Office of Mental Health (hereinafter OMH) and the Department of Health (hereinafter DOH) memorialized certain reforms to the State's mental health system that the agencies viewed as critical to implement the goal of deinstitutionalization, including providing options for more community-based, integrated housing for persons with mental illness. To that end, DOH issued a notice of proposed rulemaking enumerating certain actions it was going to take to "limit the number of residents with serious mental illness in large adult homes" throughout the state, including defining adult homes with "a certified capacity of 80 beds or more in which 25 percent or more of the resident population are persons with serious mental illness" as "transitional" (Notice [*3]of Proposed Rulemaking, 2012 NY Reg Text 300713 [NS], 18 NYCRR 487.13 [b] [1] [Aug. 8, 2012]). OMH, in turn, issued clinical advisories in 2012 concluding that such facilities "are not clinically appropriate . . . for the significant number of persons with serious mental illnesses who reside in such settings, nor are they conducive to the rehabilitation or recovery of such persons" (NY St Off of Mental Health Clinical Advisory, Aug. 8, 2012; see NY St Off of Mental Health Clinical Advisory, Oct. 1, 2012).[FN2]
In 2013, DOH then formally promulgated regulations defining transitional adult homes in the manner set forth above (see 18 NYCRR 487.13 [b] [1]) and placed an admissions cap on such facilities precluding them from "admit[ting] any person whose admission will increase the mental health census of the facility" (18 NYCRR 487.4 [d] [hereinafter referred to as the admissions cap]). Mental health census "means the number of residents in a facility who are persons with serious mental illness as defined in [18 NYCRR 487.2 (c)]" (18 NYCRR 487.13 [b] [4]). The regulations require transitional adult homes to submit to the State "a compliance plan that is designed to bring the facility's mental health census to a level that is under 25 percent of the resident population over a reasonable period of time, through the lawful discharge of residents with appropriate community services to alternative community settings" (18 NYCRR 487.13 [c]). Once a transitional adult home has adequately reduced its mental health census, nothing in the regulations precludes it from admitting residents with serious mental illness provided it remains within the census. The regulations also contain a waiver permitting former residents of a transitional adult home to return to the facility even if readmission increases the mental health census above the 25% cap (see 18 NYCRR 487.4 [e] [3] [ii] [b]).
After respondent Commissioner of Health (hereinafter respondent) upheld a citation finding petitioner — a privately-owned and operated transitional adult home — in violation of the admissions cap pertaining to persons with serious mental illness,[FN3] petitioner commenced this hybrid CPLR article 78 proceeding and action for declaratory judgment in 2016 challenging the regulations under various legal theories, including that the admissions cap violates the Fair Housing Act (see 42 USC § 3601 et seq. [hereinafter FHA]) by discriminating against persons with serious mental illness in terms of their housing. Following joinder of issue, motion practice and an 18-day trial, Supreme Court — in a thorough and detailed decision — granted judgment in favor of petitioner on its claim under the FHA and permanently enjoined enforcement of the regulations.[FN4]
In so doing, Supreme Court, among other things, rejected respondent's argument that the admissions cap does not violate the FHA because, rather than discriminating against individuals with serious mental illness, it furthers the integration mandate [*4]of Olmstead by "divert[ing] [such persons] away from institutions and into alternative settings that are more integrated in the community and consequently more conducive to their recovery." Instead, the court found that transitional adult homes "are not 'institutions' for purposes of Title II of the ADA or as addressed by the Supreme Court in Olmstead" insofar as they "are not owned, established, or operated by the State," "[n]one of the residents . . . are committed to or confined there against their will" and they "live in a setting far less restrictive than those of nursing homes and state psychiatric hospitals." The court further held that the regulations are "not necessary for compliance with Olmstead, nor are they narrowly tailored to suit individuals' particular needs," and that less discriminatory alternatives — such as requiring individualized assessments about whether a transitional adult home is appropriate for an individual applicant or "allowing a prospective resident to decide about living" in such residence — existed to promote the goal of integration. Respondent appeals, arguing that Supreme Court erred in finding that the challenged regulations violate the FHA.[FN5] We agree.
We begin our analysis with a basic overview of the purpose behind the FHA and the conduct that it prohibits. The FHA prohibits discrimination in housing practices against certain protected classes, including persons with both physical and mental disabilities (see 42 USC § 3602 [h] [1]). In enacting the Fair Housing Amendments Act of 1988 — which amended the 1968 version of the FHA — Congress sought, among other things, to "end the unnecessary exclusion of persons with handicaps from the American mainstream" (City of Edmonds v Washington State Bldg. Code Council, 18 F3d 802, 806 [9th Cir 1994] [internal quotation marks and citation omitted], affd 514 US 725 [1995]). To that end, the FHA makes it illegal to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter, [or] a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available" (42 USC § 3604 [f] [1] [A], [B]). The statute also prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap" (42 USC § 3604 [f] [2]), and contains a preemption clause providing that "[a]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid" (42 USC § 3615).
We agree with Supreme Court that the regulations at issue are discriminatory on their face — regardless of their remedial purpose — insofar as the admissions cap applies solely to individuals with serious mental illness (see Bangerter [*5]v Orem City Corp., 46 F3d 1491, 1500 [10th Cir 1995]; see also International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v Johnson Controls., Inc., 499 US 187, 199 [1991]). The further question is the appropriate standard to apply in gauging the propriety of the regulations under the FHA in light of the facial discrimination. The trial court determined that respondent was required "to prove that the [c]hallenged [r]egulations further, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve the interest with less discriminatory effect" (emphasis added) — a standard enunciated by the District Court for the Southern District of New York in Sierra v City of New York (552 F Supp 2d 428, 431 [SD NY 2008]). For the reasons that follow, we conclude that Supreme Court erred in utilizing the least restrictive alternative standard underscored above.
Respondent argues that the test espoused in United States v Salerno (481 US 739, 745 [1987]) governs this case. In Salerno, the Supreme Court of the United States stated that, where a facial constitutional challenge is made to a "legislative [a]ct," the petitioner must show that "no set of circumstances exists under which the [a]ct would be valid" (United States v Salerno, 481 US at 745). However, Salerno was not considering a claim under the FHA in enunciating this rule and federal Circuit Courts have largely, though not invariably, refrained from using this standard in evaluating facial challenges to housing restrictions under the FHA, instead placing the burden on the respondent to justify the differential treatment (see e.g. Community House, Inc. v City of Boise, 490 F3d 1041, 1050 [9th Cir 2007]; Larkin v State of Mich. Dept. of Social Services, 89 F3d 285, 290 [6th Cir 1996]; Bangerter v Orem City Corp., 46 F3d at 1503-1504; see also Sailboat Bend Sober Living, LLC v City of Fort Lauderdale, Fla., 46 F4th 1268, 1277 [11th Cir 2022]; but see Children's Health Defense v Federal Communications Commn., 25 F4th 1045, 1052 [DC Cir 2022]).
By promoting the Salerno test, respondent has also taken a position at odds with the standard espoused by DOJ for analyzing facial challenges under the FHA. In a "Statement of Interest of the United States of America" filed in the trial court,[FN6] DOJ urged use of a standard embraced by the Sixth, Ninth and Tenth Circuits, succinctly stated as follows: "[a] housing restriction that facially discriminates against people with disabilities will pass muster under the FHA upon a showing '(1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected[,] rather than being based on stereotypes' " (quoting Community House, Inc. v City of Boise, 490 F3d at 1050; see Bangerter v Orem City Corp., 46 F3d at 1503-1504; see also Larkin v State of Mich. Dept. of Social Servs., 89 F3d at 290-291). This standard "employ[s] a more searching method [*6]of analysis" than the rational basis test utilized by the Eighth Circuit (Community House, Inc. v City of Boise, 490 F3d at 1050; see Oxford House-C v City of St. Louis, 77 F3d 249, 252 [8th Cir 1996], cert denied 519 US 816 [1996]; Familystyle of St. Paul, Inc. v City of St. Paul, Minn., 923 F2d 91, 94 [8th Cir 1991]), and certainly requires a more heightened scrutiny than Salerno. Even when the restrictions purport to benefit the protected class, this standard requires that the means be "narrowly tailored" to effectuate the beneficial purpose (Bangerter v Orem City Corp., 46 F3d at 1504; see Community House, Inc. v City of Boise, 490 F3d at 1050; see also Larkin v State of Mich. Dept. of Social Servs., 89 F3d at 290-291).
We will follow the standard adopted by the Sixth, Ninth and Tenth Circuits as recommended by DOJ. Although DOJ is not the entity charged with implementing the FHA (see 42 USC § 3608 [a]), it has enforcement power under the statute (see 42 USC § 3614) and is specifically tasked with issuing regulations implementing Title II of the ADA (see 42 USC § 12134). In a case such as this — which concerns the interplay between the discrimination proscriptions of the FHA and the integration mandate of Title II of the ADA — DOJ's views regarding the propriety of the challenged regulations, while not requiring deference, do warrant "considerable respect" (M.R. v Dreyfus, 697 F3d 706, 735 [9th Cir 2012]; see Olmstead v L.C. ex rel. Zimring, 527 US at 598; Matter of Mental Hygiene Legal Serv., Third Jud. Dept. v Delaney, 38 NY3d 1076, 1103 [2022, Rivera, J., dissenting]). In our view, the standard employed by these Circuits — rather than the lower level of scrutiny used by the Eighth Circuit — best achieves a balance to implement the ADA and FHA mandates.
That said, we disagree with Supreme Court that the "least restrictive alternative" test is the formulation of narrow tailoring that applies. We recognize that the "least restrictive alternative" test was used in Sierra v City of New York (552 F Supp 2d at 431) when considering a claim of facial discrimination under the FHA, with the court in that case characterizing it as "essentially a broader wording" (id.) of the standard used by the Ninth Circuit in Community House, Inc. v City of Boise. In our view, however, the narrow tailoring required by the Sixth, Ninth and Tenth Circuits is a less onerous standard and does not require a showing that the challenged regulations are the least restrictive means of implementing the goal of integration (see Bischoff v Brittain, 183 F Supp 3d 1080, 1091 [ED Cal 2016] [concluding that the narrow tailoring approach of the Ninth Circuit "does not require that (the) defendants' policy be the least restrictive means of achieving the allowed interests"]; see also Rehabilitation Support Servs., Inc v City of Albany, N.Y., 2017 WL 3251597,*4 [ND NY, July 28, 2017, 14-cv-0499 (LEK/DJS)]; Human Resource Research & Mgt. Group, Inc. v County of Suffolk, 687 F Supp [*7]2d 237, 257 [ED NY 2010]).[FN7] As such, we decline to apply the "least restrictive alternative" test in analyzing whether the challenged regulations are narrowly tailored to achieve the goal of integration.
Before engaging in that analysis, a few more points warrant discussion. For reasons unknown, Supreme Court did not account for DOJ's view that the challenged regulations do not violate the FHA (see Olmstead v L.C. ex rel. Zimring, 527 US at 598). Supreme Court also erred in concluding that, because transitional adult homes are privately owned and operated, Title II of the ADA does not apply in this case and, therefore, cannot serve as a valid justification for the admissions cap. The discrimination proscriptions of Title II of the ADA apply to public entities, defined as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government" (42 USC § 12131 [1] [A], [B]). Such public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" (28 CFR 35.130 [d]). Supreme Court's determination that adult homes, including transitional adult homes, are not "public entities" for purposes of Title II of the ADA evinces a misunderstanding of the nature of the claim being asserted here. Unlike the situation in Green v City of New York (465 F3d 65, 78-79 [2d Cir 2006]) — upon which Supreme Courtrelied — this is not a circumstance where an individual is bringing an ADA claim against a private entity. Rather, petitioner is challenging regulations promulgated by the State in accordance with its plan to administer its mental health services in the "most integrated setting appropriate to the needs of qualified individuals with disabilities," as it is required to do under the ADA (28 CFR 35.130 [d]; see 28 CFR 35.130 [b] [7]).
The State — through its agencies — plays a crucial role in the licensure, inspection and operation of adult homes (see Social Services Law §§ 460-b, 461, 461-a; 18 NYCRR parts 485-487), and "administer[s] the State's mental health service system, plan[s] the settings in which mental health services are provided, and allocate[s] resources within the mental health service system" (Disability Advocates, Inc. v Paterson, 598 F Supp 2d 289, 317 [ED NY 2009]). The State's administration of its mental health services, including in adult homes, is subject to the ADA's integration mandate regardless of whether the adult homes at issue are privately owned and operated (see id.). Moreover, Supreme Court's determination that transitional adult homes cannot be equated to the type of institutions at issue in Olmstead rests upon too narrow a reading of that decision and ignores the trial evidence equating such facilities to institutionalized settings (see 28 CFR 35.130 [d]; Guggenberger v Minnesota, 198 F Supp 3d 973, 1026 [D Minn 2016]).
Turning to the merits, we conclude [*8]that, under the standard applied by the Sixth, Ninth and Tenth Circuits, the challenged regulations do not violate the FHA. When considering the justification proffered by respondent in support of the regulations — i.e., to benefit individuals with serious mental illness by implementing the integration mandate of Olmstead — the circumstances under which they were promulgated cannot be overlooked. Under the ADA, the phrase "most integrated setting appropriate to the needs of qualified individuals with disabilities" means " 'a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible'" (28 CFR part 35, App. B [2011] [former App. A, p. 450 (1998)] [emphasis added]). DOH adopted these regulations to come into compliance with this mandate, in direct response to federal lawsuits challenging the State's provision of services to individuals with mental illness living in adult homes on the ground that their rights under the ADA were being violated, and in tandem with the O'Toole settlement discussions negotiating a proposed remedy. A fundamental component of the O'Toole settlement is that the State provide additional supportive housing in the community and facilitate the process for residents of adult homes to make informed choices about relocating back into the community. The challenged regulations complement that objective by limiting the admission of new residents with a serious mental illness into transitional adult homes (see Residents & Families United to Save Our Adult Homes v Zucker, 2017 WL 5496277 at *11).
At trial, respondent presented testimony from several experts — including Lloyd Sederer, OMH's former chief medical officer who issued the 2012 advisories, and other mental health professionals — who consistently testified that transitional adult homes are akin to institutionalized settings and are not beneficial to recovery for people with serious mental illness because, among other things, they lack integrative, community-based, mental health services, restrict the ability of persons with serious mental illness to interact with persons who do not have serious mental illness, and do not require employees to have mental health training. Sederer, a licensed psychiatrist and public health physician, explained that the concept of "recovery" in this context speaks to the improved functioning of a person with a mental illness, enhancing his or her personal dignity and quality of life. Sederer opined that the institutionalized practices of adult homes were not conducive to the recovery of a resident with a serious mental illness. As Justice Ginsberg noted in Olmstead, " '[c]ourts normally should defer to the reasonable medical judgments of public health officials' " (Olmstead v L.C. ex rel. Zimring, 527 US at 602, quoting School Bd. of Nassau County v Arline, 480 US 273, 288 [1987]). There was also testimony that smaller facilities are beneficial to the recovery of people with serious mental [*9]illness by providing more individualized support. Supreme Court rejected the testimony of these experts mainly due to the absence of statistical data supporting their conclusions. However, statistical data was not necessary to support the challenged regulations (see Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health, 85 NY2d 326, 332 [1995]; Sierra v City of New York, 579 F Supp 2d 543, 551 [SD NY 2008]) and the trial court's wholesale rejection of the State's witnesses was unwarranted (see generally Specfin Mgt. LLC v Elhadidy, 201 AD3d 31, 37 [3d Dept 2021]; Maisto v State of New York, 196 AD3d 104, 115 [3d Dept 2021]). In reviewing a nonjury verdict on appeal, this Court has broad authority to independently evaluate the evidence and render a judgment warranted by the facts, with due deference to the trial court's credibility assessments (see Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499 [1983]). On this record, we conclude that respondent has demonstrated that the admissions cap was implemented to benefit, rather than to discriminate against, persons with serious mental illness (see generally Bangerter v Orem City Corp., 46 F3d at 1504 n 22; compare Community House, Inc. v City of Boise, 490 F3d at 1051).
As for the means used to achieve the beneficial purpose, we further conclude that respondent has demonstrated that the challenged regulations are narrowly tailored to implement the integration mandate of Title II of the ADA and that the "benefit to the [protected class from the subject regulations] . . . clearly outweigh[s] whatever burden may result to them" (Bangerter v Orem City Corp., 46 F3d at 1504; compare Larken v State of Mich. Dept. of Social Servs., 89 F3d at 291).[FN8] The admissions cap applies only to people with a serious mental illness — those "who have a designated diagnosis of mental illness under the Diagnostic and Statistical Manual of Mental Disorders . . . and whose severity and duration of mental illness results in substantial functional disability" (18 NYCRR 487.2 [c] [emphasis added]). Accordingly, the cap is specifically tailored to the very individuals who are the subject of the integration mandate. Rather than limiting admissions to all adult homes, the regulations apply solely to a subcategory of large adult homes — those certified with at least an 80-bed capacity — where new admissions would increase the population of persons with serious mental illness over the 25% threshold.[FN9] As transitional adult homes are large facilities and the most segregated to begin with, the admissions cap benefits persons with serious mental illness by directly implementing integration into smaller and more diverse settings where people with serious mental illness have greater ability to exercise autonomy and interact with individuals who do not have serious mental illness, enhancing their chances of recovery. Moreover, once the mental health census of a transitional adult home [*10]has been sufficiently reduced below the cap, the facility may resume accepting residents with serious mental illness. The regulations also contain a waiver permitting transitional adult homes to admit individuals with serious mental illnesses who were previously residents — even if it increases the mental health census of the facility above the 25% threshold. In these circumstances, we cannot agree with Supreme Court's finding that the means used to implement the goal of integration are not narrowly tailored insofar as the regulations do not provide for individualized assessments. Indeed, there was testimony at trial that utilizing a more individualized approach could impede the State's integration goal and, as already noted, the least restrictive means of effectuating the beneficial purpose is not required.
In closing, we must stress the "importance of leaving room for flexible solutions to address the complex problem of discrimination and to realize the goals established by Congress in the [FHA]" (Bangerter v Orem City Corp., 46 F3d at 1505). Although the challenged regulations may not be a perfect solution to the problem articulated in Olmstead, they reflect a sound public health policy judgment undertaken in conjunction with the State's mental health experts to implement reasonable modifications to the State's provision of services in furtherance of the " 'national mandate for the elimination of discrimination against individuals with disabilities' " (Olmstead v L.C. ex rel. Zimring, 527 US at 589, quoting 42 USC § 12101 [b] [1]). We conclude that respondent has sufficiently demonstrated that the challenged regulations "benefit[ ] the protected class"(Community House, Inc. v City of Boise, 490 F3d at 1050; see Bangerter v Orem City Corp., 46 F3d at 1503-1504; see generally Familystyle of St. Paul, Inc. v City of St. Paul, Minn., 923 F2d at 93-94),[FN10] and are sufficiently narrowly tailored to implement the goal of integration. Accordingly, the amended judgment of Supreme Court should be reversed. Our determination renders academic respondent's additional argument regarding Supreme Court's use of the "arbitrary and capricious" standard of review.
Garry, P.J., Pritzker, Reynolds Fitzgerald and McShan, JJ., concur.
ORDERED that the amended judgment is reversed, on the law, without costs; petition dismissed; and it is declared that the challenged regulations do not violate the Fair Housing Act.

Footnotes

Footnote 1: Adult homes are "adult-care facilit[ies] established and operated for the purpose of providing long-term residential care, room, board, housekeeping, personal care and supervision to five or more adults unrelated to the operator" (18 NYCRR 485.2 [b]).

Footnote 2: In a 2013 report by the State's Olmstead Commission providing recommendations for serving New Yorkers with disabilities in the most integrated setting, the Commission also highlighted the importance of moving persons with serious mental illness from "segregated settings" — including "adult homes" — into more integrated community placements (Report and Recommendations of the Olmstead Cabinet, A Comprehensive Plan for Serving People with Disabilities in the Most Integrated Setting, at 8, 9 [Oct. 2013], available at https://www.criminaljustice.ny.gov/
opca/pdfs/9-Olmstead-Cabinet-Report101013.pdf [last accessed Mar. 31, 2023]).

Footnote 3: The record contains evidence that, as of 2013, over 90% of petitioner's residents were persons with serious mental illness. This number dropped to around 47% by 2019.

Footnote 4: The FHA claim was the only one remaining by the time of trial.

Footnote 5: This Court stayed enforcement of Supreme Court's judgment "pending determination of the appeal taken therefrom, except as it applies to individuals whose admissions were scheduled on or before November 2, 2022" (2022 NY Slip Op 74905[U] [3d Dept 2022]).

Footnote 6: DOJ filed this statement of interest pursuant to its authority under 28 USC § 517, which entitles it "to attend to the interests of the United States in a suit pending . . . in a court of a State."

Footnote 7: Although we are bound by the decisions of the Supreme Court of the United States on issues of federal law (see People v Kin Kan, 78 NY2d 54, 59-60 [1991]), that is not the case with respect to decisions of lower federal courts where there is a lack of uniformity (see Flanagan v Prudential-Bache Sec., 67 NY2d 500, 506 [1986], cert denied 479 US 931 [1986]; 31 Carmody-Wait 2d § 172:92). As such, we decline to apply the portion of Sierra finding that the least restrictive alternative test is the appropriate formulation of heightened scrutiny to apply in this type of case.

Footnote 8: We note that several federal district courts have, in a different context, rejected the proposition that it is a violation of the ADA to "place[ ] . . . an institutionalized disabled person in a community-based treatment program unless" consent is given and an individualized assessment is made (Richard C. ex rel. Kathy B. v Houstoun, 196 FRD 288, 292 [WD Penn 1999], affd sub nom. Richard C. v Snider, 229 F3d 1139 [3d Cir 2000]; see Richard S. v Department of Dev. Servs. of Cal., 2000 WL 35944246, *3 [CD Cal, Mar. 27, 2000, 97-cv-219-GLT (ANx)];Sciarillo ex rel. St. Amand v Christie, 2013 WL 6586569, *4 [D NJ, Dec. 13, 2013, 13-cv-03478 (SRC)]; Black v Department of Mental Health, 83 Cal App 4th 739, 754-755 [2d Dist Cal, 2020]).

Footnote 9: At the time of trial, less than 10% of the approximately 400 adult homes in the state met the definition of a transitional adult home.

Footnote 10: We cite Familystyle of St. Paul, Inc. — an Eighth Circuit case — solely for the proposition that the "goals of non-discrimination and deinstitutionalization" are "compatible" (923 F2d at 93-94), and not for the proposition that rational basis scrutiny should apply in these cases.